**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT  84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| VANESSA MYERS, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FASTENAL COMPANY, | : | Case No. |
| | : | |
| Defendant. | : | Hon. |

COMES NOW, the Plaintiff Vanessa Myers (hereinafter sometimes referred to as "Ms. Myers"), by and through her counsel, David J. Holdsworth, and complains of Defendant Fastenal Company (hereinafter sometimes referred to as "Fastenal" or "the Company"), demands trial by jury and as and for causes of action alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Vanessa Myers is an individual, a U.S. citizen and a resident of the State of Utah.

2.      Defendant Fastenal Company is an entity which does business in the State of Utah, and which has a place of business in Salt Lake County at 1871 South 4800 West, Salt Lake City, UT 84129.

3.      Plaintiff brings this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended, for discrimination in employment and for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000 e (5). Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g). Jurisdiction is also conferred by the Americans with Disabilities Act ("ADA"). Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq.

4.      Venue of this action is properly set in the District of Utah pursuant to 28 U.S.C. § 1391 (b) (1) in that Defendant is a corporation and has a place of business in the District of Utah, and the events, discussions and omissions giving rise to the claims alleged herein occurred in the District of Utah.

5.      Venue of this action is also properly set forth in the District of Utah, pursuant to the special venue provision of Title VII, 42 U.S.C. § 2000e (5) (f) (3) in that the District of Utah is the judicial district in which the unlawful employment practices are alleged to have been committed, and is the judicial district in which the employment records relevant to such practices are maintained and administered.

**STATEMENT OF FACTS**

6.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 5 above as if alleged in full herein.

7.    Fastenal Company is a company that is engaged in the manufacturing and distribution of fastenings, fixtures, and other related industrial, commercial and construction supplies.

8.    Fastenal supplies its network of 2,600 stores through large distribution centers called hubs.  Fastenal maintains a hub in Salt Lake City.  This hub is the hub in question in the instant case (hereinafter sometimes referred to as "UHUB").

9.    The UHUB Regional Operations Manager during the time in question was Mike Humphries (hereinafter sometimes referred to as "Mr. Humphries").  At times relevant hereto, the Assistant Manager of the UHUB was Josh Nicholls (hereinafter sometimes referred to as "Mr. Nicholls").

10.    On or about April 9, 2008, Fastenal Company, through its agent Jordi Day (hereinafter sometimes referred to as "Mr. Day"), hired Ms. Myers as a "picker."

11.    As a "picker," Ms. Myers' responsibilities included moving inventory in the UHUB warehouse in preparation for shipping the inventory to Fastenal stores in the region which the UHUB facility serviced.

3

12.     After Fastenal hired Ms. Myers, Fastenal (contrary to its publicized anti-harassment and anti-discrimination policies) failed to provide anti-harassment and anti-discrimination training to Ms. Myers.  During Ms. Myers' four years of employment with Fastenal, Fastenal never once publicized any notification of such training or invited Ms. Myers to attend any such training.

13.     On or about October 3, 2008, Fastenal promoted Ms. Myers to the position of Customer Service Lead.

14.     On or about February 10, 2010, Fastenal promoted Ms. Myers to the position of Help Desk Lead.

15.     Ms. Myers worked hard and performed at a level that met, or exceeded her employer's expectations.  (*See* the Fastenal Servant's Heart Award presented to Ms. Myers); (*see also* August 4, 2011 e-mail message from Mr. Humphries to UHUB Distribution) (in which Mr.  Humphries informs Fastenal staff of Ms. Myers' dedication, passion, and leadership)); (*see also* the November 14, 2012 e-mail message from Josh Reinke (General Manager, hereinafter sometime referred to as "Mr. Reinke") to Mr. Humphries and Ms. Myers) (in which Mr.  Reinke expresses his gratitude to Ms. Myers for going above and beyond her job duties)); (*see also* the December 14, 2012 e-mail message from Tom Gunlach (District Manager, hereinafter sometimes referred to as "Mr. Gunlach") to Fastenal employees) (praising Ms. Myers'

4

"can do" attitude, and expressing his gratitude to Ms. Myers for going above and beyond her job duties)); (*see also* SWOT Analysis for Ms. Myers) (outlining Ms. Myers' strengths, and, more importantly, weaknesses—which contain no mention of disciplinary problems)).  Ms. Myers had no disciplinary problems while working for Fastenal.

16.     During Ms. Myers' employment with Fastenal, she developed an H. Pylori infection in her stomach, which ultimately developed into gastric cancer.  As a complication of the infection and eventual gastric cancer, Ms. Myers experienced severe stomach aches, pain and bloating, vomiting blood, as well as weakness and fatigue.

17.     These conditions substantially limited several of Ms. Myers' major life activities, including eating, sleeping, concentrating, thinking, interacting with others and working.

18.     On or about February 22, 2012, Ms. Myers made Mr. Humphries aware that she had several impairments and serious health conditions.  Mr. Humphries then informed other Fastenal managers of Ms. Myers' health conditions.

19.     In addition, at all times relevant hereto, Ms. Myers' minor son had cerebral palsy—a congenital disorder affecting the brain and central nervous system, impairing human body functioning such as movement, hearing, seeing, learning and

5

thinking.  Ms. Myers' son's cerebral palsy required occasional hospitalizations and/or operations.

20.     By 2010, Ms. Myers had made Fastenal (through Mr.  Humphries) aware that her son had some serious health conditions and/or disabilities. In 2013, Ms. Myers discussed her son's surgery with  Mr. Humphries and provided him with documentation regarding her son's surgery.

21.     On multiple occasions, Ms. Myers made Mr. Humphries aware of her own health impairments and serious health conditions (and those of her son) and, in turn, on or about February 22, 2012, Mr. Humphries told other Fastenal employees about Ms. Myers' situation.  (*See* e-mail message from Daniel Lund (hereinafter referred to as "Mr. Lund") to Ms. Myers) (in which Mr. Lund expresses his condolences for Ms. Myers' situation and acknowledging that Mr. Humphries had told him about the situation); (*see also* April 5, 2012 e-mail message from Mr. Lund to Ms. Myers) (in which Mr. Lund asks Ms. Myers if she is feeling better); (*see also* August 20, 2012, e-mail message from Mr. Humphries to Ms. Myers,) (in which Mr. Humphries expresses his hope that Ms. Myers' son is doing better).

22.     From time to time, Ms. Myers informed Mr. Humphries about her own health impairments and serious health conditions (and the health impairments and serious health conditions of her son) so as to inform him that, sometimes, in dealing

6

with those conditions, she might sometimes need to be late to work and/or absent from work.  This was a request for a reasonable accommodation.

23.     After Ms. Myers informed Mr. Humphries of her situation with her disabilities (and those of her son) and made her requests, Mr. Humphries responded to her requests for accommodations by informing her that it was fine if she was late or if she missed work, but she just needed to provide advance notice whenever possible. In addition to such requests Ms. Myers asked Mr. Humphries if he needed Ms. Myers to have her doctors fill out any paper work either for himself, or for the Fastenal corporate offices. In response, Mr. Humphries told Ms. Myers not to worry or stress about her job, and expressed "we just want you to get better."

24.     Ms. Myers acknowledges that throughout the course of Ms. Myers' employment, there were times when she was late, and there were times when she was absent from work; however, Ms. Myers contends that each time she was late or absent she either provided advance notice, or, when it was not feasible to provide advance notice, she, after the fact, provided a doctor's note excusing the late arrival or absence.

25.     On information and belief, Ms. Myers alleges that prior to February 2012, Fastenal managers and supervisors expressed no concern about her

tardies and/or attendance and the manner in which she provided advance notice or after the fact doctors' notes but accommodated her as she had requested.

26.     Ms. Myers alleges that beginning in approximately early 2012, when Ms. Myers was late to work, or when she missed work (even when she gave prior notice) or when she returned to work with a doctor's note excusing her absence, managers/supervisors of Fastenal stopped accommodating her and began to issue Ms. Myers' written discipline for her attendance. Upon information and belief, Ms. Myers alleges managers openly discussed her disability during staff meeting.  In addition, Ms. Myers alleges that Fastenal coworkers and management began telling her that she was becoming a burden to her team because of the work days she missed. Ms. Myers alleges that coworkers also made negative remarks suggesting that there always seemed to be something wrong with her son.

27.     Ms. Myers alleges upon information and belief that in September 2012, Steve Goodoey (Fastenal employee) who happened to be in the front office taking tests on a front office computer, overheard Jaleesa Darris (Administrative Human Resources Lead, hereinafter referred to as "Ms. Darris") telling Rachel Greene (Fastenal employee) that "if Ms. Myers had a stomach problem, then why was [Ms. Myers] still overweight?"

28.     Furthermore, Ms. Myers alleges that company coworkers and managers subjected her to frequent and egregious ridicule and embarrassment and adverse treatment regarding her disability.  For example, upon information and belief, Ms. Myers alleges Ms. Darris frequently commented to other Fastenal employees that Ms. Myers just used her own disabilities and/or her son's disabilities as an excuse to "get out of work" and it was "unfair" to her because Ms. Myers was missing so much work.

29.     In March 2012, Ms. Myers informed Mr. Humphries that her son needed surgery, and that such surgery was scheduled for June 2012. In June 2012, Ms. Myers took off work to be with her son in the hospital during his surgery and recovery. Upon information and belief, Ms. Myers alleges that while Ms. Myers was in the hospital with her son, Ms. Darris called the hospital at which Ms. Myers' son was undergoing surgery, in order to check on whether Ms. Myers' son was, in fact, at the hospital undergoing a surgery that day.

30.     In August 2012, Mr. Humphries approached Ms. Myers about having Ms. Myers apply for a management position.  Ms. Myers told Mr. Humphries that she would think about it.  Shortly thereafter, Ms. Myers informed Mr. Humphries that she did, in fact, want to be considered for the management position.  (*See* August 21, 2012 e-mail message from Ms. Myers to Mr. Humphries).

31.     Shortly after Ms. Myers communicated her intent to apply for the management position to Mr. Humphries called Ms. Myers into his office and told her that she would no longer be considered for a promotion to a management position. Mr. Humphries accused Ms. Myers of having a bad attitude and not being a team player. Subsequently, Mr. Humphries gave the management position to another employee and told Ms. Myers to not retaliate against the girls in the office (Jaleesa and Rachel).

32.     In late 2012, Ms. Myers informed Mr. Humphries, Mr. Lund and Mr. Nicholls, that due to her gastric cancer, she might need to take off some time in the beginning of 2013 to receive intensive treatment for her cancer.

33.     Shortly after Ms. Myers notified the company that she might possibly need to take off time in early 2013 to receive intensive treatment for her cancer, Fastenal treated her even more adversely.  Indeed, on information and belief, she alleges that thereafter, managers/supervisors of Fastenal began looking for reasons to discipline her and to fire her.

34.     In late 2012/early 2013, Ms. Myers applied for the Quality Manager position at the packaging plant.  However, upon information and belief, Ms. Myers alleges Fastenal denied Ms. Myers the position because she had notified the company that she might possibly need to take off work in the near future to address her health issues.

35.     In late February 2013, Mr. Humphries and Mr. Nicholls informed Ms. Myers that she was no longer needed as the help desk lead, and that they were unilaterally reassigning her to be the full time lead in "picking."  Ms. Myers alleges that while she was informed of her reassignment, neither Mr. Nicholls or Mr. Humphries or her new lead, Curt Gardner, explained to Ms. Myers their expectation of her job duties or responsibilities. Ms. Myers alleges that neither Mr. Nicholls or Mr. Humphries informed her whom she was to report to or what her regular schedule would be. The company never gave Ms. Myers a set schedule. As to her start time, Mr. Humphries simply asked Ms. Myers to come in on her first day of picking around 9:00 a.m. or 9:30 a.m. so she could assist the help desk with their immediate orders.

36.     In such position, Fastenal sometimes scheduled Ms. Myers to work alone and to work only half of the day.  This made it difficult for Ms. Myers to continue receiving the flexibility in scheduling and attendance which Fastenal had previously afforded her.

37.     As a matter of customary practice, Fastenal employees routinely and regularly gave away damaged product as scrap metal.

38.     Upon information and belief, Ms. Myers alleges Mr. Humphries on several occasions gave away damaged product as scrap metal.

11

39.     In or about December 2012, maintenance manager, Justin Sharp (hereinafter "Mr. Sharp"), gave away several Fastenal ladders that had become damaged.

40.     In February 2013, the shipping lead, McLayne (hereinafter "McLayne"), scanned a Fastenal ladder in as "damaged" and then placed the ladder in the damaged/scrap area.

41.     On or about February 28, 2013, four or five days after McLayne had placed the "damaged" ladder in the damaged/scrap area, Ms. Myers gave the damaged ladder away as scrap metal (to Junkers).

42.     After Ms. Myers did so, Mr. Humphries/Mr. Nicholls then singled out Ms. Myers and issued her written discipline for giving away the damaged ladder which McLayne had placed in the damaged/scrap area.

43.     The following day, Mr. Humphries issued Ms. Myers a "service failure" for missing product (referring to the ladder). Ms. Myers alleges that she tried to speak to Mr. Humphries to inform him that he had issued the service failure mistakenly and that it was McLayne who had not followed procedures, not Ms. Myers, and that the ladder was not missing but had been scanned in as damaged, but that Mr. Humphries responded that it was not up for debate and demanded that she filled out the form and sign the service failure form and give it back to him (which she did).

12

44.     At approximately 9:30 a.m. on March 6, 2013, Ms. Myers called both Mr. Humphries and Mr. Nicholls to inform them that due to her need to take care of her son, she would be a little late to work; however, neither Mr. Humphries or Mr. Nicholls answered the phone.

45.     Because Ms. Myers had not been able to get a hold of Mr. Humphries or Mr. Nicholls, Ms. Myers then called to try and speak with Ms. Darris. Ms. Darries was "too busy" to take the call from Ms. Myers so Ms. Myers told Amber that she would be late to work.

46.     Ms. Myers then arrived to work that day at approximately 10:20 a.m.

47.     As soon as Ms. Myers arrived at work, she was handed a number of orders that needed to be completed immediately, as customers were waiting in the front office.

48.     Ms. Myers tried to clock in twice, but the time clock could not read her finger print and kept saying "Error–Retry". Ms. Myers alleges that this is not unusual (as the KRONOS time clock has a hard time reading fingerprints sometimes). Rather than continuing to fuss with the time clock Ms. Myers immediately began filling the orders for the customers who were waiting without clocking in because she was a salaried employee, not an hourly employee, and she believed it to be in the best

interest of the company to start filling the orders for the customers who were waiting and to take care of the clocking in task later.  Ms. Myers alleges other employees have had problems with the KRONOS clock and have bypassed the check-in function and have gone straight to work without generating adverse action towards them.

49.    Later, when Curt Gardner ( hereinafter "Mr. Gardner") (at the time the full-time picking lead) arrived at work, Ms. Myers notified him that she had been late to work (she did not mention what time she had arrived).  She did mention she had not yet clocked in and that they would need to fix it later.

50.    On information and belief, Ms. Myers alleges Mr. Gardner unilaterally, without checking with Ms. Myers and without Ms. Myers' knowledge, permission, or approval, erroneously logged her in as having started at 9:15 a.m. that morning, instead of 10:20 a.m.

51.    Later that same day, Mr. Humphries approached Ms. Myers and accused her of falsifying her time by stating that she arrived at 9:15 a.m.

52.    Ms. Myers denied falsifying her time on the time clock (and denied even being involved inputting her time or telling Mr. Gardner what time she had arrived).  Ms. Myers also explained to Mr. Humphries that she would not have told Mr. Gardner that she arrived at work at 9:15 a.m., because she didn't even call Mr. Humphries to attempt to notify him that she would be late until approximately 9:30

14

a.m.  Mr. Nicholls then escorted Ms. Myers out of the building without allowing her access to retrieve any personal belongings, clean out her emails, etc...

53.     Ms. Myers did not have access or ability to change her time on the computer.  Accordingly, Ms. Myers then requested that she and Mr. Humphries go and talk with Mr. Gardner about the clocking in situation.  However, Mr. Humphries refused to go with Ms. Myers to talk to Mr. Gardner and emphatically stated, "It's a done deal!"—referring to the fact that he and perhaps other managers/supervisors of Fastenal had decided to terminate her employment—and thereupon Mr. Humphries terminated Ms. Myers' employment.

54.     Ms. Myers alleges the reason for the termination was false and pretextual.

55.     The following day, Ms. Myers called Renee Wisecup (Human Resources Manager, hereinafter "Ms.  Wisecup") to make a complaint; however, Ms. Wisecup told Ms. Myers that if Ms. Myers had any questions, she could call Mr. Humphries at the UHUB, and then hung up the phone on Ms. Myers.

56.     Ms. Myers did not call Mr. Humphries to report a complaint of discrimination to him because with him being the actor, to do so would have been futile.

**CAUSES OF ACTION**

## FIRST CAUSE OF ACTION
## FOR DISCRIMINATION ON THE BASIS OF DISABILITY
## IN VIOLATION OF THE ADA

57.     Plaintiff incorporates by this reference all allegations listed in paragraph 1 through 56 above as if alleged in full herein.

58.     Ms. Myers has an impairment within the meaning of the ADA.

59.     During Ms. Myers' employment with Fastenal, she developed an H. Pylori infection in her stomach, which ultimately developed into gastric cancer.  Ms. Myers' symptoms included: stomach aches, pain and bloating, vomiting blood, as well as weakness and fatigue.

60.     Ms. Myers' infection, cancer, and accompanying symptoms substantially limited one or more of Ms. Myers' major life activities, including eating, sleeping and working and constitute a disability.

61.     Fastenal regarded Ms. Myers as having a disability.

62.     Ms. Myers was a qualified individual under the ADA in that she was able to perform the essential functions of her job, with or without a reasonable accommodation.

63.     Ms. Myers was a qualified individual with a disability in that she satisfied or exceeded her employer's performance expectations.

64.    Ms. Myers is also qualified on the basis of a known disability of an individual with whom she was known to have a relationship or association.

65.    Ms. Myers' minor son has cerebral palsy and because she needed to care for her own impairment and/or serious health condition, and to care for her son with cerebral palsy, Ms. Myers was sometimes late to work or absent from work.

66.    In addition, Fastenal (through Mr. Humphries and other Fastenal agents) had knowledge that Ms. Myers had impairments and/or serious health conditions and that Ms. Myers' son had cerebral palsy and that because Ms. Myers needed to care for her son with cerebral palsy, she would sometimes be late or absent from work.

67.    Fastenal treated Ms. Myers disparately on the basis of her own disabilities and the known disabilities of one with whom she had a known relationship or association.  Fastenal afforded more favorable treatment to other Fastenal employees who did not have to care for individuals with disabilities in the areas of compensation, work schedules, assignments, discipline and interaction.

68.    Fastenal made adverse decisions regarding Ms. Myers' employment and promotional opportunities based, in whole or in part, on her own disabilities or the known disabilities of one with whom Ms. Myers had a known relationship or association.

17

69.     Fastenal ultimately terminated Ms. Myers' employment based in whole or in part on her own disabilities or the known disabilities of one with whom Ms. Myers had a known relationship or association.

70.     Such actions constitute violations of the Americans with Disabilities Act.

71.     Such violations have caused Ms. Myers injuries, losses, and other damages.

### SECOND CAUSE OF ACTION
### FOR FAILURE TO PROVIDE A REASONABLE
### ACCOMMODATION UNDER THE ADA

72.     Plaintiff incorporates by this reference all allegations listed in paragraph 1 through 71 above as if alleged in full herein.

73.     Through its agents, Fastenal was clearly aware that Ms. Myers' suffered from a health impairment and/or serious health condition which ultimately developed into gastric cancer and which constituted a disability within the meaning of the ADA.

74.     On several occasions, Ms. Myers submitted a doctor's note excusing her absences from work. Ms. Myers alleges that even with her absences, she never exceeded the amount of time-off that Fastenal provided her with each year. (2 weeks vacation per year, 1 week of sick leave/ personal time off, per year)

75.     At the end of 2012, Ms. Myers informed Mr. Humphries, Mr. Lund and Mr. Nicholls that she might need to take some time off of work in the beginning of 2013 to address her health impairments and serious health conditions.

76.     That notice, along with all other notices Fastenal had of Ms. Myers' health conditions, triggered Fastenal's obligation to engage in an interactive process with Ms. Myers to discover reasonable accommodations.  However, Fastenal never engaged in an interactive dialogue with Ms. Myers to provide her with a reasonable accommodations.  Instead, it immediately terminated her employment.

77.     Fastenal ultimately terminated Ms. Myers' employment based in whole or in part on her own disabilities or the known disabilities of one with whom Ms. Myers had a known relationship or association.

78.     Fastenal's failure to engage in an interactive dialogue, failure to provide Ms. Myers with reasonable accommodations and decision to terminate her employment constitute violations of the Americans with Disabilities Act.

79.     Such violations have caused Ms. Myers injuries, losses, and other damages.

## THIRD CAUSE OF ACTION
## FOR RETALIATION

80.     Plaintiff incorporates by this reference all allegations listed in paragraph 1 through 79 above as if alleged in full herein.

19

81.     Through its agents, Fastenal was clearly aware that Ms. Myers' suffered from health impairments and/or serious health conditions which ultimately developed into h-pylori, divertisis colitis, and gastric cancer and constituted a disability.

82.     On several occasions, Ms. Myers requested various reasonable accommodations.  For example, when she needed to miss work because of her disability, she either gave advance notice or submitted a doctor's note excusing her absences from work.

83.     By so doing, Ms. Myers engaged in protected activity.

84.     Beginning in approximately mid-2012, Fastenal began treating Ms. Myers disparately and adversely.  Fastenal supervisors and managers afforded more favorable treatment to other Fastenal employees who cared for individuals with disabilities than it did to Ms. Myers.

85.     Thereafter, on multiple occasions, Fastenal supervisors and managers wrote up Ms. Myers for her tardiness and/or absences (even where Ms. Myers provided advance notice and/or, after the fact, presented a doctor's note excusing the absence).  Ms. Myers alleges that notwithstanding her absences, she never exceeded the allotment of time/days off Fastenal provided her with each year.

86.     At the end of 2012, Ms. Myers informed Mr. Humphries, Mr. Lund and Mr. Nicholls that she might need to take some time off of work in the beginning of 2013 to address her health impairments and/or serious health conditions.

87.     Shortly after making Fastenal aware that she intended to possibly take some time off work in early 2013 to undergo intensive treatment for her health concerns, the company took materially adverse action against Ms. Myers.

88.     Shortly after Ms. Myers informed Fastenal that she might need to take some time off in early 2013 to address her health issues, Mr. Humphries began writing up Ms. Myers for engaging in actions that were customary practice at UHUB.

89.     A causal connection exists between Ms. Myers' protected activity and Fastenal's adverse against Ms. Myers.

90.      Ms. Myers called Ms. Wisecup to make a complaint of discrimination, however, Ms. Wisecup directed Ms. Myers to report the complaint, if any, to Mr. Humphries, and hung up the telephone.

91.     Myers had previously discussed her concerns about disparate and adverse treatment on account of her disability with Mr. Humphries, to no avail. Ms. Myers did not make a new complaint of discrimination to Mr. Humphries because he was the individual (actor) Ms. Myers alleges engaged in the discrimination, and, therefore, making such a report or complaint to the same actor would have been futile.

92.     Ms. Myers alleges that she did report her complaints of disparate and adverse treatment on account of her disability to Daniel Lund (hereinafter "Mr. Lund").

93.     Ms. Myers alleges Fastenal ultimately terminated Ms. Myers' employment because she engaged in protected activity.

94.     The actions alleged above constitute a violation of the anti-retaliation provisions of the ADA.

95.     Such adverse actions have caused Ms. Myers to suffer injuries, losses, and other damages.

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations set forth herein and the evidence to be assembled, discovered, adduced, and propounded in support of these allegations, Ms. Myers respectfully requests the court to for the following relief:

1.     For a judgment awarding her damages in the form of lost wages, lost benefits, emotional distress, mental anguish, physical pain and suffering, and other damages;

22

2.      For attorney's fees, court costs and any other such relief as the

Court deems just and equitable.

DATED this 16th day of June, 2014.

    /s/ David J. Holdsworth                    
David J. Holdsworth
*Attorney for Plaintiff*

VERIFICATION

Vanessa Myers, being first duly sworn, upon her oath, deposes and says that she is the Plaintiff in the above-entitled action, that she has read the foregoing COMPLAINT and understands the contents thereof, and the allegations made therein are true of her own knowledge, except as to those matters alleged on information and belief which she believes to be true.


   /s/ Vanessa Myers
Vanessa Myers


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of June, 2014.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:    RESIDING AT: _____

_____